SHORT RECORD
NO. 26-1596
FILED 03/27/2026

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB, )<br><br>    *Petitioner,* )<br><br>    v. )<br>)<br>UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY, and )<br>LEE ZELDIN, in his )<br>official capacity as Administrator )<br>of the United States Environmental )<br>Protection Agency, )<br>)<br>    *Respondents.* )<br>)<br>) | Case No. _____ |

### PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), and Federal Rule of Appellate Procedure 15(a), Sierra Club files this petition for review of the U.S. Environmental Protection Agency's ("EPA") final action entitled *Air Plan Approval; Indiana; Regional Haze Plan for the Second Implementation Period,* 91 Fed. Reg. 3,057 (Jan. 26, 2026) (to be codified at 40 C.F.R. Part 52), attached as Ex. A.

This petition for review is timely filed within 60 days of the date of publication in the Federal Register. 42 U.S.C. § 7607(b)(1).

Dated: March 27, 2026

Respectfully submitted,

*/s/ Greg Wannier*
Greg Wannier
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5765
greg.wannier@sierraclub.org

*/s/ Kristin Henry*
Kristin Henry
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 235-0947
kristin.henry@sierraclub.org
*Motion for admission to be filed*

*/s/ Tony Mendoza*
Tony Mendoza
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5589
tony.mendoza@sierraclub.org
*Motion for admission to be filed*

*Counsel for Sierra Club*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of Mach 2026, the foregoing Petition for Review was served on Respondents by sending a copy via Federal Express to each of the following addresses:

Administrator Lee M. Zeldin
United States Environmental Protection Agency
Office of the Administrator
EPA Headquarters 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Attorney General Pam Bondi
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Correspondence Control Unit
United States Environmental Protection Agency
Office of General Counsel
EPA Headquarters 2310A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/Greg Wannier*
Greg Wannier

*Counsel for Petitioner*

# Exhibit A


# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

[EPA–R05–OAR–2021–0963; FRL–12589–02–R5]

## Air Plan Approval; Indiana; Regional Haze Plan for the Second Implementation Period

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving the Regional Haze State Implementation Plan (SIP) revision for Indiana submitted by the Indiana Department of Environmental Management (IDEM or Indiana) on December 29, 2021, as satisfying applicable requirements under the Clean Air Act (CAA) and EPA's Regional Haze Rule (RHR) for the program's second implementation period. Indiana's SIP submission addresses the requirement that States must periodically revise their long-term strategies for making reasonable progress towards the national goal of preventing any future, and remedying any existing, anthropogenic impairment of visibility, including regional haze, in mandatory Class I Federal areas. Indiana's SIP submission also addresses other applicable requirements for the second implementation period of the regional haze program. EPA is taking this action pursuant to sections 110 and 169A of the CAA.

**DATES:** This final rule is effective on February 25, 2026.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R05–OAR–2021–0963. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.,* Confidential Business Information (CBI), Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either through *https://www.regulations.gov* or at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Charles Hatten, Environmental Engineer, at

(312) 886–6031 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Charles Hatten, Air and Radiation Division (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–6031, *hatten.charles@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA.

## Table of Contents

I. Background
II. Public Comment Process
III. Summary of Public Comments and EPA's Responses
　A. Comments Received
　B. Comments and Responses That Are Not Specific to EPA's Uniform Rate of Progress (URP) Policy
　C. Comments and Responses That Are Specific to EPA's URP Policy
　D. EPA's Final Approval
IV. Final Action
V. Statutory and Executive Order Reviews

## I. Background

On December 29, 2021, IDEM submitted a revision to its SIP to address regional haze requirements for the second implementation period. IDEM made this SIP submission to satisfy the requirements of the CAA's regional haze program pursuant to CAA sections 169A and 169B and 40 CFR 51.308.

On June 18, 2025 (90 FR 25944), EPA proposed to approve the Indiana regional haze SIP revision. In the notice of proposed rulemaking (NPRM), EPA proposed to find that Indiana's Regional Haze SIP submission satisfied the regional haze requirements for the second implementation period contained in 40 CFR 51.308(f). As described further in EPA's proposed approval, IDEM utilized technical analyses and its source selection methodology to target the sources with the highest potential to impair visibility at mandatory Class I areas.[1] IDEM's initial list of twenty candidate sources for a four-factor analysis represented the majority of Indiana's emissions that may influence visibility impacts on out-of-state Class I areas. IDEM further refined that list by excluding eleven electric generating units (EGUs) that either had existing effective controls or that were not expected to continue operating beyond 2028. IDEM then proceeded with site-specific four-factor analyses

for the remining nine non-EGU facilities identified through this process. A detailed analysis of Indiana's plan and EPA's evaluation are contained in the NPRM, dated June 18, 2025 (90 FR 25944), as well as the Technical Support Document (TSD), dated April 22, 2025, and will not be restated here.

## II. Public Comment Process

The public review and comment period on EPA's NPRM opened June 18, 2025, and was originally scheduled to close on July 18, 2025. On June 26, 2025, EPA received a comment letter from the National Parks Conservation Association, the Coalition to Protect America's National Parks, and the Sierra Club (Comment 1) requesting that EPA provide an additional 30 days for public comment on the NPRM. On July 16, 2025 (90 FR 31923), EPA published a NPRM extending the public review and comment period to August 18, 2025.

During the review and comment period, EPA received relevant comments from the following individuals, businesses, agencies, and organizations: an individual identified as Kurtis K. (Comment 2); three anonymous commenters (Comments 3, 4, and 5); IDEM (Comment 6); Power Generators Air Coalition (Comment 7); Ameren Missouri, American Electric Power Company, Inc. on behalf of its operating companies, and Nebraska Public Power District (collectively referred as the "Utilities for Reasonable Progress") (Comment 8); Ohio Valley Electric Corporation (OVEC) and Indiana-Kentucky Electric Corporation (IKEC) (Comment 9); Abrams Environmental Law Clinic, Artists for Environmental Restoration, Inc., Citizens Climate Lobby–Evansville Chapter, Conservation Law Center, Environmental Advocacy Center at the Northwestern Pritzker School of Law, Faith in Place, Hessville Dune Dusters, Izaak Walton League–Indiana Division, Izaak Walton League–Porter County Chapter, Just Transition Northwest Indiana, National Parks Conservation Association, Owen-Putnam Friends of the Forest, Save the Dunes, Sierra Club–Hoosier Chapter, and Tri-State Creation Care (collectively referred to as "Community Organizations") (Comment 10); Mid-Atlantic/Northeast Visibility Union (MANEVU) regional planning organization (Comment 11); and National Parks Conservation Association, Sierra Club, Environmental Law & Policy Center, Coalition to Protect America's National Parks, Conservation Law Center, Save the Dunes, and the Indiana Division of the Izaak Walton League of America (collectively referred to as the

---

[1] There are no Class I areas in Indiana. However, the RHR requires SIPs to address Class I areas located outside the state that may be affected by emissions from within the state.

''Conservation Groups'') (Comments 12 through 23).

## III. Summary of Public Comments and EPA's Responses

### A. Comments Received

All comments received are included in the rulemaking docket for this action. In the December 19, 2025, Response to Comments document (RTC), which is included in the docket for this rulemaking, EPA provides summaries of and detailed responses to all significant comments that further explain the basis for our final action.

In addition to the request to extend the public comment period, EPA received comments on the NPRM addressing several topics including, but not limited to, additional emissions monitoring, increased public engagement, climate resilience, visibility trends, public health, economic benefits, enforceability of retirements, existing effective controls, four-factor analyses,[2] cost considerations, Best Available Retrofit Technology (BART), and impacts on local communities. Additionally, EPA received several comments regarding EPA's URP policy.[3]

EPA acknowledges the seven comments that were generally supportive of the proposed action and EPA's URP policy from Kurtis K. (Comment 2), two anonymous commenters (Comments 3–4), IDEM (Comment 6); PGen (Comment 7), Utilities for Reasonable Progress (Comment 8), as well as OVEC and IKEC (Comment 9). Comments received from the Community Organizations, MANEVU, and the Conservation Groups were generally opposed to EPA's proposed action: Comments 10—23. The comments, while summarized below, are available in full in the docket for this rulemaking and are addressed in EPA's December 19, 2025, RTC. The comments and EPA's responses summarized here are divided into two sections for those that are and are not specific to EPA's URP policy.

### B. Comments and Responses That Are Not Specific to EPA's URP Policy

*Comment and Response 2:* Comments from Kurtis K., while supportive of EPA's proposed action, suggested additional emissions monitoring at three facilities and increased public engagement.

As addressed in the RTC, EPA notes that the type of emissions monitoring suggested is already provided for in the federally enforceable title V permits and considered in the visibility modeling efforts for the three facilities mentioned in the comment. As to providing for public engagement after SIP implementation, EPA notes that the RHR provides for public comment on SIP revisions and the progress of the SIP, generally every five years.

*Comments and Responses 3, 4, 6, 7, 8, and 9:* Comments received from two anonymous commenters, IDEM, PGen, Utilities for Reasonable Progress, as well as OVEC and IKEC supported EPA's proposed action. EPA acknowledges their support for EPA's proposed approval.

*Comment and Response 10:* The Community Organizations asserted that EPA's proposed approval will allow pollution to continue harming the air quality, public health, and economy of local and national parks and communities.

As addressed in the RTC, Indiana has taken appropriate steps to reduce pollution that affects air quality in the affected Class I areas, including meaningful sulfur dioxide (SO$_2$) and nitrogen oxides (NO$_X$) emission reductions since the beginning of the second implementation period in 2019. Most of these emissions reductions have already occurred during the second implementation period and will continue to improve visibility in all Class I areas affected by emissions from Indiana. EPA notes that the visibility program prescribed by CAA sections 169A and 169B and implemented in 40 CFR 51.308 is not a public health-based program, and impacts on park tourism and local economies are not considerations within the Regional Haze statute or rule.

*Comment and Response 11:* MANEVU raised several items for EPA's consideration relating to changing circumstances since the time that MANEVU sent its ''Asks'' to Indiana on November 5, 2021, during the State's regional haze planning efforts. MANEVU observed that the Lake Michigan Air Directors Consortium (LADCO) has documented that modeled levels of nitrate in the winter have apparently been underestimated, and

that declining trends in visibility impairment appear to have ''flattened'' in recent years. As a result, MANEVU asserted that additional measures will be needed in the future ''to reinvigorate robust visibility improvements.''

As discussed in the RTC, EPA provides further explanation of LADCO's modeling and notes that MANEVU did not address a specific regulation or provision in question or recommend a different action on Indiana's 2021 SIP submission from what EPA proposed.

*Comment and Response 12:* The Conservation Groups assert that reducing haze pollution from Indiana facilities will improve visibility in Class I areas[4] and result in economic, public health, and environmental benefits.

As addressed in the RTC, concerns regarding public health, park visitation, and local economies are not considerations within the Regional Haze statute or rule.

*Comment and Response 13:* The Conservation Groups argue that EPA's proposal to approve the Indiana SIP Revision violates the CAA and RHR. In this regard, the Conservation Groups assert: (a) that EPA's reliance on permit limits and consent decrees, past emission reductions, and ongoing emission reductions to approve Indiana's 2021 SIP Revision is arbitrary and capricious; and (b) that Indiana failed to include federally enforceable measures in the 2021 SIP Revision for source retirements.

As detailed in the RTC, EPA disagrees with the Conservation Groups' assertions. Indiana did not rely on any planned EGU retirements, past emission reductions, reductions in utilization, or ongoing emission reductions that are not already federally enforceable as necessary to make reasonable progress in the second implementation period. As such, Indiana did not request any additional measures for the second implementation period be incorporated into the regulatory portion of Indiana's SIP at 40 CFR 52.770.

*Comment and Response 14:* The Conservation Groups assert that Indiana unreasonably refused to conduct four-factor analyses for sources that the State claimed are effectively controlled. The Conservation Groups argue that neither the CAA nor the RHR allows States to

---

[2] Under CAA 169A(g)(1), the four statutory factors are the costs of compliance, the time necessary for compliance, the energy and non-air quality environmental impacts of compliance, and the remaining useful life of any potentially affected sources. See also 40 CFR 51.308(f)(2)(i). An evaluation of potential control options for sources of visibility impairing pollutants based on applying the four statutory factors in CAA section 169A(g)(1) is referred to as a ''four-factor'' analysis.

[3] A change in Agency policy was introduced in the approval of West Virginia's regional haze plan. See the April 18, 2025, (90 FR 16478) proposed rule) and the July 7, 2025, (90 FR 29737) final rule.

[4] Areas statutorily designated as mandatory Class I Federal areas consist of national parks exceeding 6,000 acres, wilderness areas and national memorial parks exceeding 5,000 acres, and all international parks that were in existence on August 7, 1977. CAA 162(a). There are 156 mandatory Class I areas. The list of areas to which the requirements of the visibility protection program apply is in 40 CFR part 81, subpart D. Class I Federal areas are hereinafter referred to as ''Class I areas''.

eliminate sources from the four-factor statutory analysis on the basis that they are effectively controlled. The Conservation Groups contend that Indiana's demonstrations of existing effective controls are flawed and that reasonable controls or upgrades are available for these facilities at some of the State's largest sources of regional haze-causing emissions, including Duke–Gibson, Alcoa–Warrick Power Plant, AEP–Rockport, IKEC–Clifty Creek, and Duke–Cayuga.

As further discussed in the RTC, EPA addresses this comment as well as comments regarding each of these five facilities below under Comments and Responses 14a to 14f, respectively.

*Comment and Response 14a:* Existing Effective Control Demonstrations. As described in more detail in the RTC, EPA disagrees with the notion that CAA sections 169A(b)(2) and (g)(1) and the RHR prohibit States from foregoing a four-factor analysis based on a State determination that a source is effectively controlled. As outlined in the 2017 RHR preamble, ''the EPA has consistently interpreted the CAA to provide States with the flexibility to conduct four-factor analyses for specific sources, groups of sources or even entire source categories, depending on State policy preferences and the specific circumstances of each State.'' [5] However, within the bounds of the flexibility afforded to States, EPA also stated that States must ''exercise reasoned judgment when choosing which sources, groups of sources or source categories to analyze.'' [6] In the 2019 Guidance, section 3(f), EPA explained when it may be appropriate to forgo a four-factor analysis for sources with existing effective control measures and provided examples where a full four-factor analysis would likely result in the conclusion that no further controls are necessary. [7] EPA evaluated Indiana's Regional Haze SIP submission and concludes that IDEM's source selection methodology, thresholds, and justification for not conducting a four-factor analysis on all sources for this second implementation period are reasonable. EPA also concludes that IDEM sufficiently demonstrated that the sources selected for further evaluation at the facilities listed under this comment

below are effectively controlled for the second implementation period.

*Comment and Response 14b:* Duke–Gibson. The Conservation Groups assert that excluding Duke–Gibson Unit 5 from LADCO's emissions projections in the 2028 visibility modeling was arbitrary and unlawful since there is no legal requirement preventing the unit from continuing to operate beyond 2028. The Conservation Groups further state that the existing $NO_X$ and $SO_2$ emission controls on Duke–Gibson Units 1, 2, 3, 4, and 5 are underperforming and that upgrades to the existing controls would likely be feasible and cost-effective.

As described in further detail in the RTC, EPA disagrees with this comment and notes that the assumptions used in modeling future projections were based on the best available information at the time. Although there is no current legal obligation for Unit 5 to retire, EPA continues to find that IDEM has sufficiently demonstrated that Units 1, 2, 3, 4, and 5 are effectively controlled for the second implementation period and that a four-factor analysis would not likely result in the conclusion that further controls are necessary for reasonable progress. In this regard, consistent with the 2019 Guidance, IDEM showed that the $SO_2$ emission rates for all units are below the 2012 Mercury and Air Toxics Standards (MATS) for coal-fired EGUs. Additionally, $NO_X$ emission rates are below the 0.08 pounds per million metric British thermal units (lbs/MMBtu) level for EGUs with optimized selective catalytic reduction (SCR) under the Revised Cross-State Air Pollution Rule (CSAPR) Update, [8] flue gas desulfurization (FGD) control efficiencies are greater than 90 percent, and SCR control efficiencies are greater than 80 percent.

*Comment and Response 14c:* Alcoa–Warrick Power Plant. The Conservation Groups argue that Indiana should conduct a four-factor analysis on Alcoa–Warrick Power Plant's Units 1, 2, 3, and 4.

As described in further detail in the RTC, EPA disagrees with this comment and notes that IDEM has sufficiently demonstrated that Alcoa–Warrick Power Plant Units 1, 2, 3 and 4 are effectively controlled for the second implementation period. All four units are subject to BART emission limitations from the first implementation period on a pollutant-specific basis and continue to operate BART controls. Thus, as described in the 2019 Guidance, although BART-eligible sources should not be

categorically excluded from further analysis in each planning period, the source is currently operating controls to meet BART emission limits, and it is unlikely that there will be further available reasonable controls. Based on the information provided in Indiana's SIP submission and the BART analysis, IDEM appropriately demonstrated that a full four-factor analysis would likely result in the conclusion that no further controls are necessary.

*Comment and Response 14d:* AEP–Rockport. The Conservation Groups state that the existing $NO_X$ and $SO_2$ emission controls on AEP–Rockport Units 1 and 2 are underperforming and that a four-factor analysis should have been performed.

As further explained in the RTC, EPA disagrees with this comment and maintains that IDEM has sufficiently demonstrated that AEP–Rockport MB1 and MB2 are effectively controlled for the second implementation period. In this regard, as described in the 2019 Guidance, IDEM showed that with the recent installation of enhanced dry sorbent injection (DSI) and SCR on MB2, the $SO_2$ emission rates for both boilers are below the 0.2 lbs/MMBtu level for coal-fired EGUs in the 2012 MATS, and $NO_X$ emission rates are below the 0.08 lbs/MMBtu level for units with SCR under the Revised CSAPR Update.

*Comment and Response 14e:* IKEC–Clifty Creek. The Conservation Groups argue that additional cost-effective $NO_X$ and $SO_2$ emission controls are likely to exist for IKEC–Clifty Creek's six EGUs and that a four-factor analysis should have been performed.

As described in greater detail in the RTC, EPA disagrees with this comment and maintains that IDEM has sufficiently demonstrated that IKEC–Clifty Creek Units 1–6 are effectively controlled for the second implementation period as described in the 2019 Guidance, with FGDs achieving 98 percent $SO_2$ control efficiency, SCRs and overfire air achieving 70–90 percent $NO_X$ control on an annual basis, and actual $SO_2$ emission rates for all six units below the 2012 MATS level for coal-fired EGUs. Additionally, IDEM has thoroughly documented $NO_X$ emissions that are progressively constrained on an annual basis under the Revised CSAPR Update Rule and the lack of potential controls for $NO_X$ that IDEM considers cost-effective.

*Comment and Response 14f:* Duke–Cayuga. The Conservation Groups argue that Indiana should be required to conduct a four-factor analysis on Duke–Cayuga's two coal-fired EGUs Units 2

---

[5] 82 FR 3088, January 10, 2017.

[6] 82 FR 3088, January 10, 2017.

[7] *See* section 3(f) of EPA's ''Guidance on Regional Haze State Implementation Plans for the Second Implementation Period,'' EPA Office of Air Quality Planning and Standards, Research Triangle Park, August 20, 2019 (2019 Guidance) which is publicly available at *https://www.epa.gov/sites/default/files/ 2019-08/documents/8-20-2019_-_regional_haze_ guidance_final_guidance.pdf.*

[8] *See* 86 FR 23054, 23088, April 30, 2021.

and 3 and that cost-effective options for additional $NO_X$ emission controls would likely be cost-effective.

As explained in greater detail in the RTC, EPA disagrees with this comment and maintains that IDEM has sufficiently demonstrated that Duke–Cayuga Units 2 and 3 are effectively controlled for the second implementation period. In this regard, as described in the 2019 Guidance, IDEM documented FGD systems achieving 95 percent control efficiency, $SO_2$ rates that are below MATS for coal fired units, and $NO_X$ emissions that are controlled by low-$NO_X$ burners with separated over fire air and SCR achieving 88 percent control efficiency.

*Comment and Response 15:* The Conservation Groups contend that EPA neglected its duty to review Indiana's source-specific four-factor analyses. The Conservation Groups also argue that IDEM did not rigorously analyze controls that the Conservation Groups maintain are likely cost effective and, in so doing, did not appropriately require additional control measures for any of the nine sources IDEM evaluated to reduce emissions to make reasonable progress. The nine sources include: (a) Lone Star Industries, Inc.–Greencastle dba Buzzi Unicem USA; (b) Cleveland-Cliffs Steel, LLC–Indiana Harbor East and Indiana Harbor West; (c) Cleveland-Cliffs Steel, LLC–Burns Harbor; (d) U.S. Steel–Gary Works; (e) SABIC Innovative Plastics–Mt. Vernon, LLC; (f) Warrick Newco LLC, formerly Alcoa Warrick Operations, LLC; (g) Cokenergy, LLC; and (h) Heidleberg Materials US Cement LLC–Mitchell Plant, formerly Lehigh Cement Company, LLC–Mitchell Plant.

As further explained in the RTC and as outlined in our NPRM and April 22, 2025, TSD, EPA carefully evaluated Indiana's 2021 SIP submission along with the comments from the Federal Land Managers (FLMs) consultation and the State's public notice period, as well as the State's responses to those comments. Based on the complete record, EPA explained its decision to approve the SIP and took comment on the proposed approval in the NPRM. EPA recognizes that IDEM worked directly with the sources to conduct extensive site-specific technical work and provide full documentation in support of its 2021 SIP to submit complete four-factor analyses evaluating potential feasible and reasonable control measures. In the NPRM and April 22, 2025, TSD, EPA documented the existing controls, permit limitations, control options, potential reductions, and potential costs for new controls that the State relied upon in its four-factor analyses. In making its determinations,

IDEM properly considered the four statutory factors along with projected 2028 visibility conditions for Class I areas influenced by emissions from Indiana sources, emission reductions that have occurred, and current control technologies in concluding no additional controls were necessary to make reasonable progress.

*Comment and Response 15a:* Lone Star Industries, Inc.–Greencastle dba Buzzi Unicem USA. The Conservation Groups state that IDEM's four-factor analysis should have also evaluated SCR and lacked documentation with the consideration of selective non-catalytic reduction for the remaining useful life and interest rate in the cost calculations. The Conservation Groups also contend that Indiana reached its conclusions before the FLM consultation period and the public comment period.

As explained in detail in the RTC, EPA disagrees and notes that IDEM did consider SCR in determining feasible control options. For each control option evaluated, IDEM also provided extensive site-specific documentation, including an explanation of the control technologies, applicability, the limitations, expected removal efficiencies and performance, as well as considerations for cost analyses for both capital and operating costs and the relationship with reduction efficiency.

Further, EPA disagrees with the Conservation Groups' allegations that IDEM failed to incorporate FLM comments in its planning. EPA believes IDEM genuinely and consistently portrayed its intentions by clearly stating, ''it is important to address the FLMs comments as thoroughly as possible to show that Indiana has seriously evaluated the selected sources . . .'' [9] EPA finds in this final rulemaking that Indiana has satisfied the consultation and public notice requirements of 40 CFR 51.102 and 51.308(i).

*Comment and Response 15b:* Cleveland-Cliffs Steel, LLC–Indiana Harbor East and Indiana Harbor West. In addition to the potential controls examined in the four-factor analyses, the Conservation Groups assert that IDEM should have evaluated additional emission controls for the No. 5 Boiler House, Blast Furnace Stoves, Lime Kilns, and Walking Beam Furnaces.

As described in further detail in the RTC, EPA disagrees with this comment and notes that IDEM explained that Indiana Harbor East and Indiana Harbor West identified control measures that were commercially demonstrated on

similar applications by searching air permits for other iron and steel mills and other similar sources, the Nucor 2010 Best Available Control Technology (BACT) analysis,[10] as well as EPA's Reasonably Available Control Technology (RACT), BACT, and Lowest Achievable Emission Rate (LAER) Clearinghouse (RBLC).[11] The RBLC contains case-specific information on the ''best available'' air pollution technologies that have been required to reduce the emission of air pollutants from stationary sources. EPA maintains that IDEM's approach produced an extensive list of control measures relevant to the industry that had proven effective for certain applications and identified a thorough set of control measures for evaluation.

Regarding the cost analyses, IDEM and Cleveland-Cliffs Steel, LLC provided a thorough explanation, justification, and documentation of the cost parameters used in four-factor analyses as well as in its responses to the comments from the FLMs that appropriately considered site-specific factors. The Conservation Groups provided their own cost calculations, but their estimates did not include site-specific factors.

*Comment and Response 15c:* Cleveland-Cliffs Steel, LLC–Burns Harbor. In addition to the emission control options examined in the four-factor analysis, the Conservation Groups assert that IDEM should have evaluated additional options for the Coke Batteries, Coke Ovens, and Coke Oven Gas Export Line as well as provided better documentation for parameters such as the remaining useful life and interest rate in the cost calculations.

As discussed further in the RTC, EPA disagrees with this comment and notes that IDEM provided sufficient documentation and identified control measures that were commercially demonstrated on similar applications by searching air permits for other iron and steel mills and other similar sources, the Nucor 2010 BACT analysis, as well as EPA's RBLC. EPA notes that IDEM's approach produced an extensive list of control measures relevant to the industry that had proven effective for certain applications and identified a thorough set of control measures for evaluation. For the Coke Batteries, Coke Ovens, and Coke Oven Gas Export Line,

---

[9] Appendix P, p.3 of Indiana's 2021 SIP submission.

[10] Nucor Steel Louisiana ''Consolidated Environmental Management Inc.–Nucor Steel Louisiana, Best Available Control Technology Analyses,'' March 1, 2010 (Nucor 2010 BACT).

[11] EPA's RBLC is available through *https://cfpub.epa.gov/rblc/index.cfm?action=Home.Home* and *https://www.epa.gov/catc/ractbactlaer-clearinghouse-rblc-basic-information.*

the four-factor analysis search found no examples where SCR or wet scrubbers had been installed and successfully operated to control $NO_X$ and $SO_2$ emissions under similar physical and operating conditions to those at Burns Harbor.[12]

Although the Conservations Groups assert that the cost analyses lacked documentation, IDEM and Cleveland-Cliffs Steel, LLC provided a thorough explanation, justification, and documentation of the cost parameters used in the four-factor analysis and in its responses to the comments from the FLMs.

*Comment and Response 15d:* U.S. Steel–Gary Works. In addition to the emission control options examined in the four-factor analysis, the Conservation Groups assert that IDEM should have evaluated SCR for the 84″ Strip Mill Reheat Furnace and used different values in the cost analysis for low-$NO_X$ burners on the Waste Heat Boilers 1 and 2.

As described in more detail in the RTC, EPA disagrees with this comment. EPA notes that IDEM identified control measures that were commercially demonstrated on similar applications by searching air permits for other iron and steel mills and other similar sources, the Nucor 2010 BACT analysis, and EPA's RBLC. However, IDEM's search did not find a SCR that had been installed and successfully operated on a similar source and under similar operating conditions as Gary Works.

Regarding the cost analyses for low-$NO_X$ burners for Waste Heat Boiler 1, although the Conservations Groups provided their own cost calculations using different parameters, EPA notes that IDEM and U.S. Steel–Gary Works provided a thorough explanation, justification, and documentation of the cost parameters used in the four-factor analysis[13] and in its responses to the comments from the FLMs[14] that appropriately considered site-specific factors that the Conservation Groups' estimates did not.

*Comment and Response 15e:* SABIC Innovative Plastics–Mt. Vernon, LLC. The Conservation Groups assert that IDEM's four-factor analysis lacked consideration of all emission sources besides the Co-generation Unit and COS Vent Oxidizer as well as appropriate

assumptions for costs and remaining useful life.

As detailed further in the RTC, EPA disagrees with this comment and notes that of the emission sources listed in the facility's title V permit,[15] the Co-generation Unit accounted for the largest portion of the facility's total potential to emit $NO_X$ at 39 percent. Based on this, EPA agrees that IDEM appropriately focused its evaluation of potential emission reduction for $NO_X$ on the Co-generation Unit rather than the emissions from the other boilers and units. Although the Conservation Groups assert that IDEM did not provide underlying calculations and supporting information, EPA notes that the four-factor analysis provided a solid basis for calculating the total capital investment and cost effectiveness and documentation was provided in Section 15 and appendices I and J of Indiana's 2021 SIP submission.

*Comment and Response 15f:* Warrick Newco LLC, formerly Alcoa Warrick Operations, LLC. The Conservation Groups assert that the four-factor analysis should have evaluated $NO_X$ emissions as well as $SO_2$ emissions and provided better documentation for figures used in the cost calculations.

As discussed in further detail in the RTC, EPA disagrees with this comment and notes that $NO_X$ emissions from Alcoa Warrick Operations, LLC represented the lowest levels of all the sources that IDEM evaluated for a four-factor analysis. As such, IDEM's decision at the time to focus resources on addressing potential controls in the second implementation period for only $SO_2$ was well reasoned. EPA also determined that IDEM provided sufficient relevant documentation for the economic and emissions information used in the four-factor analysis.

*Comment and Response 15g:* Cokenergy, LLC. The Conservation Groups claim that the four-factor analysis was not a four-factor analysis, but rather a recitation of studies and projects, and should have also evaluated DSI and upgrades to other existing systems.

As further addressed in the RTC, EPA disagrees with this comment and notes that the summaries of the previous studies and projects served to develop a set of technically feasible control options for evaluation and that the four-factor analysis then addressed each of the statutory four factors in turn.

Although the Conservation Groups assert that several other specific options should have been addressed, many of those suggested by the Conservation Groups were considered during the course of the studies mentioned above, including evaluations of installing or upgrading DSI, spray dryer absorbers, and atomizers. EPA notes that these options, along with the other options evaluated, represented a reasonable selection of control options.

*Comment and Response 15h:* Heidleberg Materials US Cement LLC–Mitchell Plant, formerly Lehigh Cement Company, LLC–Mitchell Plant. The Conservation Groups note that IDEM selected this source for a four-factor analysis but did not complete one.

As described in additional detail in the RTC, EPA notes that, pursuant to an amended Federal consent decree,[16] Lehigh will be permanently ending operations of Kilns 1, 2, and 3 by the end of 2025. In the future, Lehigh will be installing and operating SCR and meeting the NSPS for Portland Cement Plants (40 CFR 60, subpart F) for any new kilns.

*Comment and Response 16:* The Conservation Groups argue that source-specific BART determinations in the first implementation period need to be reassessed. Under 42 U.S.C. 7491(b)(2)(A), the Conservation Groups state that the CAA established BART as a mandatory part of "each applicable implementation plan" for "each" BART-eligible source that emits "any" air pollutant which may cause or contribute to "any" impairment of visibility in "any" Class I area.

As explained further in the RTC, EPA disagrees that States are required to conduct BART analyses anew in the second regional haze implementation period and onward. Specifically, EPA disagrees that its second implementation period regulations require a BART analysis for second implementation period SIPs. Pursuant to 40 CFR 51.308(e)(5), once Indiana satisfied the BART requirements in the first implementation period, Indiana's BART-eligible sources were then subject to the long-term strategy requirements in 40 CFR 51.308(f) for the second

---

[12] For lists obtained during the search of EPA's RBLC and air permits, *see* appendices A and B of appendix B of appendix I to Indiana's 2021 SIP submission.

[13] *See* section 13.10, 13.11, 13.12 and appendices I and J of Indiana's 2021 SIP submission.

[14] *See* appendix S to Indiana's 2021 SIP submission.

[15] Title V Permit 129–45722–00002 for SABIC Innovative Plastics–Mt. Vernon, LLC issued June 16, 2023, is publicly available at *https://permits.air. idem.in.gov/45722f.pdf.*

[16] *See USA, State of Indiana, State of Iowa, State of Maryland, State of New York, Pennsylvania Department of Environmental Protection, Jefferson County Board of Health, and Bay Area Air Quality Management District* v. *Lehigh Cement Company, LLC and Lehigh White Cement Company, LLC,* Civil Action No. 5:19–cv–05688–JFL in United States District Court, Eastern District of Pennsylvania. The initial and amended consent decrees are available in the docket and at *https://www.justice.gov/enrd/consent-decree/file/1223121/dl; https://www.justice.gov/enrd/consent-decree/file/1352971/dl.*

implementation period. As stated throughout our proposal and this final action, EPA finds that Indiana properly met the long-term strategy requirements of 40 CFR 51.308(f) in the second implementation period.

*Comment and Response 17:* The Conservation Groups assert that EPA should analyze the impact of Indiana regional haze pollution on local communities since the same pollutants contributing to regional haze also contribute disparately to public health impacts on people residing closest to the sources. The Conservation Groups state that people living in these communities tend to be exposed to higher levels of particulate matter and $NO_X$ and tend to have less access to quality health care to treat the impacts of environmental pollution.

As discussed in more detail in the RTC, with respect to public health concerns, the primary national ambient air quality standards provide public health protection. In contrast, the visibility program, prescribed by CAA sections 169A and 169B and implemented in 40 CFR 51.308, is not a health-based program. EPA is acting upon Indiana's 2021 Regional Haze SIP submission as required by regional haze regulations at 40 CFR 51.308.

*Comment and Response 23:* The Conservation Groups commented that EPA must withdraw its proposal to approve Indiana's 2021 SIP Revision and disapprove it.

For the reasons stated in the NPRM, EPA's April 22, 2025, TSD, EPA's December 19, 2025, RTC, this notice of final rulemaking, and the foregoing summary of responses to comments in this docket, EPA disagrees that Indiana failed to satisfy the requirements of the CAA and RHR. EPA also disagrees that EPA's proposed approval of Indiana's 2021 SIP Revision was fundamentally flawed in such a way as to make it ineffective at achieving reasonable progress in the second implementation period. Thus, as proposed in the NPRM, EPA is finalizing its approval of Indiana's 2021 SIP Revision as satisfying the applicable requirements under the CAA and RHR for the program's second implementation period.

*C. Comments and Responses That Are Specific to EPA's URP Policy*

EPA received several comments regarding EPA's URP policy. Comments from IDEM (Comment 6), PGen (Comment 7), Utilities for Reasonable Progress (Comment 8), and OVEC and IKEC (Comment 9) were supportive of EPA's URP policy. Comments from the Community Organizations (Comment

10b), MANEVU (Comment 11a) and the Conservation Groups (Comments 18–22) were opposed to EPA's URP policy.

In this final action, EPA is affirming that it is now the Agency's policy that, where visibility conditions for a Class I Federal area impacted by a State are below the URP and the State has considered the four statutory factors, the State will have presumptively demonstrated reasonable progress for the second implementation period for that area. EPA acknowledges that this final action reflects a change in policy as to how the URP should be used in the evaluation of regional haze second implementation period SIPs but believes that this policy better aligns with the purpose of the statute and RHR: achieving "reasonable" progress towards natural visibility.

As described in the approval of West Virginia's regional haze plan (90 FR 29737, July 7, 2025), EPA has discretion and authority to change its policy. In *FCC* v. *Fox Television Stations, Inc.,* the U.S. Supreme Court plainly stated that an agency is free to change a prior policy and "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." 556 U.S. 502, 515 (2009) (referencing Motor *Vehicle Mfrs. Ass'n of United States, Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)). *See also Perez* v. *Mortgage Bankers Assn.,* 135 S. Ct. 1199 (2015).

The Class I areas impacted by emissions from Indiana sources are all below the 2028 URP, and IDEM's SIP submission demonstrated that the State took into consideration the four reasonable progress factors listed in CAA 169A(g)(1) [17] with respect to an adequate number of emissions sources. Thus, EPA determines that Indiana's SIP revision is fully approvable under the Agency's new URP policy. Indeed, we think this policy better aligns with the statutory goal because it recognizes the considerable improvements in visibility impairment that have been made by a wide variety of State and Federal programs in recent decades.

In developing the regulations required by CAA section 169A(b), EPA established the concept of the URP for

each Class I area. The URP is determined by drawing a straight line from the measured 2000 to 2004 baseline conditions (in deciviews) for the 20 percent most impaired days at each Class I area to the estimated natural conditions (in deciviews) for the 20 percent most impaired days in 2064. From this calculation, a URP value can be calculated for each year between 2004 and 2064. EPA developed the URP to address the diverse concerns of Eastern and Western States and account for the varying levels of visibility impairment in Class I areas around the country while ensuring an equitable approach nationwide. For each Class I area, States must calculate the URP for the end of each planning period (*e.g.,* in 2028 for the second implementation period).[18] 40 CFR 51.308(f)(1)(vi)(A). States may also adjust the URP to account for impacts from anthropogenic sources outside the United States and/ or impacts from certain wildland prescribed fires. 40 CFR 51.308(f)(1)(vi)(B). Then, for each Class I area, States must compare the reasonable progress goal (RPG) for the 20 percent most impaired days to the URP for the end of the planning period. If the RPG is above the URP, then an additional "robust demonstration" requirement is triggered for each State that contributes to that Class I area. 40 CFR 51.308(f)(3)(ii)(B).

In the 2017 RHR Revisions, EPA addressed the role of the URP as it relates to a State's development of its second implementation period SIP. 82 FR 3078 (January 10, 2017). Specifically, in response to comments suggesting that the URP should be considered a "safe harbor" that relieves States of any obligation to consider the four statutory factors, EPA explained that the URP was not intended to be such a safe harbor. *Id.* at 3099. "Some commenters stated a desire for corresponding rule text dealing with situations where RPGs are equal to ('on') or better than ('below') the URP or glidepath. Several commenters stated that the URP or glidepath should be a 'safe harbor,' opining that States should be permitted to analyze whether projected visibility

---

[17] The four statutory factors required to be taken into consideration in determining reasonable progress are: the costs of compliance, the time necessary for compliance, and the energy and non-air quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements. CAA section 169(g)(1).

[18] We note that RPGs are a regulatory construct that we developed to address the statutory mandate in CAA section 169B(e)(1), which required our regulations to include "criteria for measuring 'reasonable progress' toward the national goal." Under 40 CFR 51.308(f)(3)(ii), RPGs measure the progress that is projected to be achieved by the control measures a State has determined are necessary to make reasonable progress. Consistent with the 1999 RHR, the RPGs are unenforceable, though they create a benchmark that allows for analytical comparisons to the URP and mid-implementation-period course corrections if necessary. 82 FR 3091–3092 (January 10, 2017).

conditions for the end of the implementation period will be on or below the glidepath based on on-the-books or on-the-way control measures, and that in such cases a four-factor analysis should not be required.'' *Id.*

Other comments indicated a similar approach, such as ''a somewhat narrower entrance to a 'safe harbor,' by suggesting that if current visibility conditions are already below the end-of-planning-period point on the URP line, a four-factor analysis should not be required.'' *Id.* EPA stated in its response that we did not agree with either of these recommendations. ''The CAA requires that each SIP revision contain long-term strategies for making reasonable progress, and that in determining reasonable progress States must consider the four statutory factors. Treating the URP as a safe harbor would be inconsistent with the statutory requirement that States assess the potential to make further reasonable progress towards natural visibility goal in every implementation period.'' *Id.*

Importantly, EPA's recently adopted policy does not make the URP a safe harbor. The policy merely creates a presumption that the State's second implementation period SIP is making reasonable progress for a Class I Federal Area if the State has taken into consideration the four statutory factors of 169A(g)(1) and that area is below the URP. This is consistent with the CAA and RHR.

*Comment and Response 11a:* Instead of relying on the RPGs, MANEVU asserts EPA's URP policy is not permissible and that EPA is now using the URP as the determinative metric, to ignore the extensive work of the States, the FLMs, and the public in developing the RPGs.

As discussed further in the RTC, EPA disagrees with MANEVU's comment. EPA's URP policy does not ignore the results of a State's four-factor analysis if a Class I area is below the URP. Consistent with EPA's discussion under the preamble of the 2017 RHR, the URP continues to serve as a regulatory planning metric to inform States' decision making when considering the four statutory factors. EPA's URP policy recognizes the considerable improvements in visibility impairment that have been made by State and Federal programs resulting from decades of work and interaction between members of State and Federal agencies and the public.

*Comment and Response 18:* The Conservation Groups argue that EPA's URP Policy violates the CAA's visibility provisions. The Conservation Groups raise several issues pertaining to EPA's

URP policy: (a) EPA's URP policy violates the plain language of the CAA, (b) EPA's contemporaneous understanding of the CAA reflects the best reading of the statute, (c) the context of the CAA's visibility provisions confirms the best reading of the statute, and (d) the purpose of the CAA's visibility provisions confirms the best reading of the statute.

EPA disagrees with each of these comments, including the Conservation Groups' position that the URP policy articulated in our proposed approval of Indiana's regional haze SIP submission is inconsistent with the CAA. The Conservation Groups' reading of the statute is not the best, and they misconstrue the recently adopted policy in several ways. EPA notes that the comments and responses on each above point are presented in detail in the RTC document.

EPA's new URP policy is consistent with the CAA. Pursuant to CAA 169A(a)(4), Congress explicitly delegated to EPA the authority to promulgate regulations regarding reasonable progress towards meeting the national goal. In determining the measures necessary to make reasonable progress, Congress mandated ''tak[ing] into consideration the cost of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirement.'' CAA 169A(g)(1).

EPA emphasizes that just because a Class I area is below the URP does not mean that a State is relieved of its obligations under the CAA and the RHR to make reasonable progress. In other words, the URP is not a ''safe harbor,'' as that phrase has sometimes been used, because EPA still must review a State's determination whether additional control measures are necessary to make reasonable progress, determine whether the State submitted those measures for incorporation into the SIP, and evaluate whether the measures are consistent with other provisions in the CAA.

As required by the statute, Indiana took into consideration the four statutory factors in CAA section 169A(g)(1) and determined that no additional controls were necessary to make reasonable progress at the sources selected. CAA section 169A(b)(2) only requires SIPs to include ''such emission limits, schedules of compliance and other measures *as may be necessary* to make reasonable progress'' (emphasis added). IDEM concluded that it was not necessary to incorporate any new emission limits, schedules of compliance, or other measures into its

SIP in light of the progress already made.

*Comments and Responses 10 and 19:* Both the Community Organizations and Conservation Groups argued that EPA's URP policy is inconsistent with the RHR.

As discussed in the RTC, EPA disagrees with the commenters' position that the URP policy is inconsistent with the RHR. This comment tracks many of the issues commenters raised with respect to their allegations that EPA's recently adopted URP policy is inconsistent with the CAA. Under the URP policy, and consistent with 40 CFR 51.308(f)(2), States are still required to identify measures necessary for reasonable progress by considering the four statutory factors set forth in CAA 169A(g)(1) and to submit measures necessary for reasonable progress to EPA to be reviewed for approvability into the SIP. The URP policy does not create an exemption to either of these provisions.

*Comment and Response 20:* The Conservations Groups comment that EPA's articulation and application of its new URP policy is unclear and incoherent. In this regard, the Conservation Groups argue: (a) Mere consideration of the four factors is inconsistent with the CAA and the RHR and is fundamentally irrational, (b) EPA fails to explain why a four-factor analysis must be rational when, under the URP policy, its result does not matter and EPA does not substantively review it, and (c) EPA further muddies the waters by considering other factors in an arbitrary and capricious way.

As discussed in detail in the RTC for Responses 20a, 20b, and 20c, EPA disagrees with the Conservation Groups' arguments mentioned above regarding EPA's application of the URP policy being unclear and incoherent. EPA's recently adopted policy is consistent with the CAA and is not arbitrary or capricious. The Conservation Groups incorrectly assert that the URP policy ignores the results of a State's four-factor analysis if a Class I area is below the URP. Just because a Class I area is below the URP does not mean that a State is relieved of its obligations under the CAA and the RHR to make reasonable progress. EPA must still review a State's determination whether additional control measures are necessary to make reasonable progress, determine whether the State submitted those measures for incorporation into the SIP, and evaluate whether the measures are consistent with other provisions in the CAA.

*Comment and Response 21:* The Conservation Groups assert that

announcing and applying EPA's new URP policy in state-specific regional actions violates the procedural requirements of the CAA under 306(a)(2) regarding consistency among Regional Offices in implementing the CAA. The Conservation Groups argue that EPA's URP policy unlawfully departs from national policy and is inconsistent with actions across EPA regions.

EPA disagrees with the Conservation Groups' position here as further explained in the RTC. EPA's change in policy is consistent with *FCC* v. *Fox Television,* 556 U.S. 502 (2009). Under *FCC* v. *Fox,* an agency's change in policy is permissible if the agency acknowledges the change, believes it to be better, and ''show[s] that there are good reasons for the new policy.'' 556 U.S. at 515. We stated our reasons for implementing the recently adopted URP policy in the final action approving the West Virginia SIP for the second implementation period. 90 FR 29737 (Jul. 7, 2025). The reasons for the recently adopted policy were more fully articulated in section V, *The EPA's Rationale for Proposing Approval,* of that proposal. 90 FR 16478 (Apr. 18, 2025). Therefore, EPA has sufficiently justified the change in policy under *FCC* v. *Fox.*

The decision in *FCC* v. *Fox* turned primarily on whether the FCC's change in policy would lead to the FCC ''arbitrarily punishing parties without notice of the potential consequences of their action.'' 556 U.S. at 517. The changed policy is prospective, which addresses the primary concern in *FCC* v. *Fox.* Additionally, the recently adopted URP policy ''aligns with the purpose of the statute and RHR, which is achieving 'reasonable' progress, not maximal progress, toward Congress' natural visibility goal.'' 90 FR 16478, at 16483. Furthermore, we note that the legislative history of CAA section 169A is consistent with our change in policy. The reconciliation report for the 1977 CAA amendments indicates that the term ''maximum feasible progress'' in section 169A was changed to ''reasonable progress'' in the final version of the legislation passed by both chambers. *See* Legislative History of the CAA Amendments of 1977 Public Law 95–95 (1977), *H.R. Rep. No. 95–564,* at 535.

EPA notes that EPA's Regional Consistency regulations at 40 CFR part 56, and in particular 40 CFR 56.5(b), are not relevant to this action. 40 CFR 56.5(b) requires that a ''responsible official in a Regional office shall seek concurrence from the appropriate EPA Headquarters office on any interpretation of the Act, or rule, regulation, or program directive when such interpretation may result in application of the act or rule, regulation, or program directive that *is inconsistent* with Agency policy'' (emphasis added). As we expressly indicated in the proposal for this action, the approval is *consistent* with the change in agency policy, first announced in *Air Plan Approval; West Virginia; Regional Haze State Implementation Plan for the Second Implementation Period.* 90 FR 16478 (Apr. 18, 2025). Therefore, there is no obligation under the EPA's Regional Consistency regulations for anyone in the region to seek concurrence from EPA Headquarters to take action consistent with EPA policy. The lack of relevance of these regulations to this action accounts for the lack of materials related to compliance with the Regional Consistency process in the docket for this rulemaking.

The Conservation Groups also argue that EPA's URP policy effectively revises the RHR and raises the question of whether it has nationwide scope and effect.

EPA disagrees with the Conservation Groups' comment here as further explained in the RTC. EPA notes that this action is ''locally or regionally applicable'' under CAA section 307(b)(1) because it applies only to a SIP submission from a single State, Indiana. *See Oklahoma* v. *EPA,* 605 U.S. 609, 620 (2025) (a SIP is ''a state-specific plan'' and ''the CAA recognizes this limited scope in enumerating a SIP approval as a locally or regionally applicable action''); *see also, Am. Rd. & Transp. Builders Ass'n,* 705 F.3d 453, 455 (D.C. Cir. 2013) (describing EPA action to approve a single SIP under CAA section 110 as the ''[p]rototypical'' locally or regionally applicable action).

Whether our proposal to approve Indiana's second implementation period SIP relies on a new national policy has no bearing on the applicability of EPA's final action. To determine whether an action is ''nationally applicable'' or ''locally or regionally applicable,'' ''court[s] need look only to the face of the agency action, not its practical effects . . . .'' *EPA* v. *Calumet Shreveport Refining, L.L.C.,* 605 U.S. 627, 642 (2025) (''[W]e determine an action's range of applicability by 'look[ing] only to the face of the [action], rather than to its practical effects.' '') (quoting *Am. Rd. & Transp. Builders Ass'n,* 705 F.3d at 456) and *Oklahoma,* 605 U.S. at 621–622 (basis for EPA action is not relevant to determining its applicability); *see also Sierra Club* v. *EPA,* 926 F.3d 844, 849 (D.C. Cir. 2019)

and *RMS of Georgia, LLC* v. *EPA,* 64 F.4th 1368, 1372 (11th Cir. 2023) (''our sister circuits have established a consensus that we should begin our analysis by analyzing the nature of the EPA's action, not the specifics of the petitioner's grievance'').

Furthermore, the comments that claim the recently adopted URP policy ''amend[s] the nationally applicable RHR'' are unsupported and incorrect. This action simply applies our recently adopted policy related to the URP in the context of EPA's evaluation of Indiana's regional haze SIP submission. Because this action applies a recently adopted policy to a SIP submission from Indiana alone, it is locally or regionally, not nationally, applicable.

Comments that claim that EPA ''must'' publish a finding that this action is ''based on a determination of nationwide scope [or] effect'' are also unsupported and incorrect. The Supreme Court has recognized that ''[b]ecause the 'nationwide scope or effect' exception can apply only when 'EPA so finds and publishes' that it does, EPA can decide whether the exception is even potentially relevant.'' *Calumet Shreveport Refining, L.L.C.,* 605 U.S. at 646, citing *Sierra Club* v. *EPA,* 47 F.4th 738, 746 (D.C. Cir. 2022). As the D.C. Circuit has also stated, the ''EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable.'' *Sierra Club* v. *EPA,* 47 F.4th at 745; *see also Texas* v. *EPA,* 983 F.3d 826, 835 (5th Cir. 2020) (''when a locally applicable action is based on a determination of nationwide scope or effect, the EPA has discretion to select the venue for judicial review'').

The Administrator has not made and published a finding that this action is based on a determination of nationwide scope or effect. Accordingly, any petition for review of this action must be filed in the United States Court of Appeals for the appropriate regional circuit.

*Comment and Response 22:* The Conservation Groups comment that Indiana's 2021 SIP submission does not meet EPA's URP policy for presumptive approval. As such, the Conservation Groups argue that Indiana: (a) would not be able to meet the RHR monitoring requirements without the IMPROVE network if its continued operation were threatened, (b) relies on adjusted URP glidepaths that do not comply with the RHR, and (c) ignores additional out-of-state Class I areas affected by visibility impairing emissions from Indiana.

EPA disagrees with these comments as further discussed in the RTC. Indiana

met the requirements of the recently adopted policy. First, the RHR requires States to submit a long-term strategy that addresses regional haze visibility impairment for each mandatory Class I Federal area within the State and for each mandatory Class I Federal area located outside the state that may be affected by emissions from the State. 40 CFR 51.308(f)(2); *see also* CAA 169A(b)(2). However, there is no specific statutory or regulatory requirement to identify the precise set of Class I areas that are affected by emissions from Indiana, and there is no requirement to establish a source contribution threshold in identifying those areas. In this case, Indiana identified affected out-of-state Class I areas, none of which are above the 2028 URP.

EPA believes Indiana has reasonably documented its impacts to in-state and out-of-state Class I areas, and they are not reasonably anticipated to cause or contribute to any impairment in any area that is above the URP.

In conclusion, IDEM took into consideration the four statutory factors in CAA section 169A(g)(1) and determined that no additional controls were necessary to make reasonable progress for the specific sources selected for four-factor analyses. CAA section 169A(b)(2) only requires SIPs to include ''such emission limits, schedules of compliance and other measures *as may be necessary* to make reasonable progress'' (emphasis added). IDEM concluded that it was not necessary to incorporate any new emission limitations, schedules of compliance, or other measures into its SIP for these sources. Thus, IDEM did not ignore the results of its consideration of the four statutory factors; rather, as supported by the recently adopted URP policy, the State properly used the URP to inform its final decision making as to the measures necessary to make reasonable progress in the second implementation period.

### D. EPA's Final Approval

EPA determines that Indiana reasonably considered the statutory and regulatory requirements and appropriately determined what measures are necessary for reasonable progress for the second implementation period. As such, EPA finds that Indiana submitted a Regional Haze SIP revision that meets all the regional haze requirements for the second implementation period.

EPA concludes that Indiana's determinations of the measures necessary for reasonable progress were based on a reasonable consideration of

the four statutory factors. IDEM thoroughly evaluated and determined the emission reduction measures that are necessary to make reasonable progress by considering the four statutory factors. IDEM also documented large statewide emissions reductions achieved during the second implementation period.

EPA is finalizing its approval of Indiana's December 29, 2021, Regional Haze SIP submission for the second implementation period as proposed.

### IV. Final Action

For the reasons set forth in the June 18, 2025, NPRM, the April 22, 2025, TSD, the December 19, 2025, RTC document, and in this final rule, EPA is approving the Regional Haze SIP revision for Indiana submitted by IDEM on December 29, 2021, as satisfying the regional haze requirements for the second implementation period contained in 40 CFR 51.308(f).

### V. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve State choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves State law as meeting Federal requirements and does not impose additional requirements beyond those imposed by State law. For that reason, this action:

• Is not a significant regulatory action subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);

• Is not subject to Executive Order 14192 (90 FR 9065, February 6, 2025) because SIP actions are exempt from review under Executive Order 12866;

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a State program;

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction. In those areas of Indian country, the rule does not have Tribal implications and will not impose substantial direct costs on Tribal governments or preempt Tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action is subject to the Congressional Review Act, and EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by March 27, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

### List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Particulate matter, Sulfur oxides.

Dated: January 6, 2026.

**Anne Vogel,**

*Regional Administrator, Region 5.*

For the reasons stated in the preamble, title 40 CFR part 52 is amended as follows:

### PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. In § 52.770, amend the table in paragraph (e) by adding a new entry for "Regional Haze Plan for the Second Implementation Period" after the entry for "Regional Haze Plan" to read as follows:

§ 52.770 Identification of plan.

* * * * *

(e) * * *

### EPA-APPROVED INDIANA NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Regional Haze Plan for the Second Implementation Period. | 12/29/2021 | 1/26/2026, 91 FR [insert **Federal Register** page where the document begins]. | Full approval. |
| * | * | * | * |

* * * * *

[FR Doc. 2026–01406 Filed 1–23–26; 8:45 am]

**BILLING CODE 6560–50–P**

## LEGAL SERVICES CORPORATION

### 45 CFR Part 1611

### Income Level for Individuals Eligible for Assistance

**AGENCY:** Legal Services Corporation.

**ACTION:** Final rule.

**SUMMARY:** The Legal Services Corporation (LSC) is required by law to establish maximum income levels for individuals eligible for legal assistance. This document updates the specified income levels to reflect the annual amendments to the Federal Poverty Guidelines issued by the U.S. Department of Health and Human Services (HHS).

**DATES:** Effective January 26, 2026.

**FOR FURTHER INFORMATION CONTACT:** Stefanie K. Davis, Deputy General Counsel and Ethics Officer, Legal Services Corporation, 1825 I St. NW, Washington, DC 20006; (202) 295–1563; *sdavis@lsc.gov.*

**SUPPLEMENTARY INFORMATION:** Section 1007(a)(2) of the Legal Services Corporation Act (Act), 42 U.S.C. 2996f(a)(2), requires LSC to establish maximum income levels for individuals eligible for legal assistance. Section 1611.3(c) of LSC's regulations establishes a maximum income level equivalent to 125% of the Federal Poverty Guidelines (Guidelines), which HHS is responsible for updating and issuing. 45 CFR 1611.3(c).

Each year, LSC updates appendix A to 45 CFR part 1611 to provide client income eligibility standards based on the most recent Guidelines. The figures for 2026, set out below, are equivalent to 125% of the Guidelines published by HHS on January 15, 2026.

In addition, LSC is publishing a chart listing income levels that are 200% of the Guidelines. This chart is for reference purposes only as an aid to recipients in assessing the financial eligibility of an applicant whose income is greater than 125% of the applicable Guidelines amount, but less than 200% of the applicable Guidelines amount (and who may be found to be financially eligible under duly adopted exceptions to the annual income ceiling in accordance with 45 CFR 1611.3, 1611.4, and 1611.5).

Except where there are minor variances due to rounding, the amount by which the guideline increases for each additional member of the household is a consistent amount.

**List of Subjects in 45 CFR Part 1611**

Grant programs—law, Legal services.

For reasons set forth in the preamble, the Legal Services Corporation amends 45 CFR part 1611 as follows:

## PART 1611—ELIGIBILITY

■ 1. The authority citation for part 1611 continues to read as follows:

**Authority:** 42 U.S.C. 2996g(e).

■ 2. Revise appendix A to part 1611 to read as follows:

### Appendix A to Part 1611—Income Level for Individuals Eligible for Assistance

### LEGAL SERVICES CORPORATION 2026 INCOME GUIDELINES *

| Size of household | 48 Contiguous States and the District of Columbia | Alaska | Hawaii |
|---|---|---|---|
| 1 | $19,950 | $24,938 | $22,950 |
| 2 | 27,050 | 33,813 | 31,113 |
| 3 | 34,150 | 42,688 | 39,275 |
| 4 | 41,250 | 51,563 | 47,438 |
| 5 | 48,350 | 60,438 | 55,600 |
| 6 | 55,450 | 69,313 | 63,763 |
| 7 | 62,550 | 78,188 | 71,925 |
| 8 | 69,650 | 87,063 | 80,088 |
| For each additional member of the household in excess of 8, add | 7,100 | 8,875 | 8,163 |

*The figures in this table represent 125% of the Federal Poverty Guidelines by household size as determined by HHS.